Omar J. Alaniz, State Bar No. 24040402
David M. Genender, State Bar No. 00790757
Fareed I. Kaisani, State Bar No. 24104017
2001 Ross Avenue, Suite 900
Dallas, Texas 75201
Telephone: (214) 953-6500
Fax: (214) 953-6503
omar.alaniz@bakerbotts.com
david.genender@bakerbotts.com
fareed.kaisani@bakerbotts.com

Danny David, State Bar No. 240228267
910 Louisiana Street
Houston, Texas 77002
Telephone: (713) 229-1234
Fax: (713) 229-1522
danny.david@bakerbotts.com

**BAKER BOTTS L.L.P.**

**COUNSEL FOR PLAINTIFFS**

# UNITED STATES BANKRUPTCY COURT
## NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

|  |  |  |
|---|---|---|
| **In re:** | ) | **Chapter 7** |
| **ERIC C. BLUE, *et al.*,**[1] | ) | **Case No. 19-33568-7** |
| Debtor. | ) | **(Jointly Administered)** |
| **PORTFOLIO SECURE LONE LLC AND ARTHUR MAXWELL,** | ) | |
| Plaintiffs, | ) | **ADVERSARY NO. 20-** |
| vs. | ) | |
| **ERIC C. BLUE,** | ) | |
| Defendant. | ) | |

---

[1] The Debtors in these jointly administered chapter 7 cases are Eric C. Blue, Capital Park Management Company, LLC, and Capital Park Private Equity Partners, LLC.

1

## PLAINTIFFS' ORIGINAL COMPLAINT

Plaintiffs Portfolio Secure Lone LLC ("PSL") and Arthur Maxwell ("Maxwell"), by and through the undersigned counsel, hereby file their *Original Complaint* (the "Complaint") against Eric C. Blue ("Blue"), and respectfully state as follows:

### PRELIMINARY STATEMENT

1.     Plaintiffs PSL and Maxwell bring this suit to redress injuries caused by Blue's fraudulent scheme.  PSL is a commercial lender and its manager is Arthur Maxwell.  In January 2019, Maxwell was introduced to Blue.  Shortly after the parties met, Blue falsely represented to Maxwell that Blue's business was preparing for a valuable merger transaction.  Blue also falsely represented that he needed a loan to pay for legal fees in connection with the merger.  The parties then negotiated what PSL thought was a loan agreement, with PSL negotiating in good faith on one hand, and Blue acting out a fraudulent scheme on the other.  PSL learned of Blue's scheme and his misrepresentations only after it transferred $1.9 million to Blue.  By then, the alleged merger, if it were to ever happen, was already dead in the water.  Blue knew this fact, but did not disclose it to PSL.  In fact, Blue continued to hide this information and continued making false representations about the alleged merger for months after he received PSL's money.  Then eventually, Blue went completely silent and began evading PSL's efforts to seek repayment.

2.     Plaintiffs now bring this suit to help remedy the harm caused by Blue's fraudulent scheme and seek a determination that all of Blue's debts to PSL and Maxwell are nondischargeable under section 523 of the Bankruptcy Code.

### JURISDICTION AND VENUE

3.     On October 29, 2019, PSL filed involuntary petitions for relief under chapter 7 of title 11 of the United States Code (the "Bankruptcy Code") against each of Blue, Capital Park

Management Company, LLC ("Capital Park MC"), and Capital Park Private Equity Partners, LLC ("Capital Park PEP," and when together with Capital Park MC and Blue, the "Debtors").

4. On December 12, 2019, the Court entered its *Order (I) Directing Joint Administration of related Chapter 7 Cases and (II) Granting Related Relief*, causing Debtors' chapter 7 cases to be jointly administered under lead Case No. 19-33568.

5. This Court has jurisdiction over this adversary proceeding under 28 U.S.C. §§ 157 and 1334.

6. This is a core proceeding under 28 U.S.C. § 157(b)(2)(I).

7. Venue in this Court is proper under 28 U.S.C. § 1409(a).

## THE PARTIES

8. PSL is a Delaware limited liability company with a place of business at 101 Huntington Avenue, Suite 500, Boston, Massachusetts.

9. Arthur Maxwell is an individual with a primary residence in Massachusetts.

10. Defendant Eric C. Blue is an individual who resides in Dallas County. Blue may be served at 3140 Harvard Avenue, Suite 402, Dallas, Texas, or wherever he may be found.

## FACTUAL ALLEGATIONS

11. The Debtors and PSL are parties to a Loan and Security Agreement dated February 1, 2019 ("Agreement"), as amended. A true and correct copy of the Agreement is attached hereto as Exhibit A.

12. Pursuant to the Agreement, PSL extended to the Debtors a loan in the original principal amount of $2,000,000 (the "Loan"), which loan was evidenced by a Secured Promissory Note dated February 1, 2019 ("Note"). A true and correct copy of the Note is attached hereto as Exhibit B.

13. Blue represented that the Loan was intended to be a short-term bridge loan in connection with a merger transaction (the "Anticipated Merger") to which Capital Park MC was a party that was anticipated to close no later than 30–40 days from the request for the Loan. Blue represented to PSL that the Loan would be repaid within 30–40 days. The Agreement explicitly limited the use of the Loan proceeds to (a) payment of PSL's legal fees and expenses in connection with the Loan; (b) a deposit by Capital Park MC in connection with the Anticipated Merger; and (c) to the extent there were any remaining proceeds, for working capital for Capital Park MC and Capital Park PEP. Agreement § 1.3.

14. As an inducement for PSL to enter into the Loan, the Debtors also agreed to issue to PSL a 3% equity interest in the surviving Anticipated Merger entity, which one or more Debtors would control. Agreement § 1.6. The Agreement made clear that the obligations under Section 1.6 fell within the scope of the Obligations, as that term is defined in the Agreement, but that the Debtors "are not entitled to any credit for punctually performing their obligations under this Section 1.6 against any amount due under the Note or under Section 1.1.2 of this Agreement, or otherwise." Agreement § 1.6.

15. The Agreement included a loan fee, due upon maturity of the Note or its earlier pre-payment in full, in the amount of $1,000,000, subject to certain adjustments for interest payments. Agreement § 1.1.2.

16. The maturity date of the Note, prior to its amendment, was the earlier of (a) April 2, 2019, and (b) the closing of the Anticipated Merger.

17. The Agreement grants PSL a security interest in "all assets" of Capital Park MC and Capital Park PEP, "whether now existing or hereafter acquired and all rights to proceeds derived from [Capital Park MC and Capital Park PEP's] assets." Agreement § 1.4.

18.    At the time the parties entered into the Agreement, Blue had an outstanding federal tax lien against him in the approximate amount of $46,000. At the closing, PSL's counsel, with the consent of PSL and the Debtors, held back $100,000 of the $2,000,000 pending resolution of the federal tax lien issue. As of the time of the closing, the parties' expectation was that the federal tax lien issue would be resolved fairly quickly. Blue insisted on seeking to resolve the tax lien issue himself, refusing PSL's offer to address and resolve the tax lien issue.

19.    As of March 28, 2019, Blue had not resolved the federal tax lien issue, which resulted in a default under the Agreement. Around this time, Blue stated that he needed an additional thirty days to repay the Note and requested that the maturity date be extended. Blue expressly stated that the Note would be repaid by the new maturity date. As an accommodation to the Debtors, PSL and the Debtors entered into an amendment to the Agreement and Note, effective as of March 28, 2019, on or about April 4, 2019 (the "Amendment"). A true and correct copy of the Amendment is attached hereto as Exhibit C. The Amendment, among other things, substituted May 1, 2019, for April 2, 2019, in the Note's definition of the maturity date. As consideration for PSL's agreement to extend the maturity date of the Note, the Debtors made a non-refundable payment of $100,000 to PSL. Amendment § 3. This payment was made by way of PSL's counsel disbursing to PSL the $100,000 of Loan proceeds that had been retained by PSL's counsel at the time the Agreement originally closed.

20.    The Debtors understood that timely performance of their repayment obligations under the Agreement and Note was important to PSL. Specifically, Blue was informed that timely repayment of the Loan prior to June 30, 2019, was important to Maxwell because of a tax savings opportunity Maxwell sought to exercise prior to June 30.

21.     In a text message dated April 30, 2019, Blue represented to Maxwell that "I told Wendell I am going to take you out on the cash portion independent of [the Anticipated Merger] and then we just square the equity component when it closes."

22.     When the Note matured on May 1, 2019, the Debtors failed to repay the Loan.  At that time, an Event of Default occurred under the Agreement.  Despite several negotiated extensions and promises that the debt would be paid, the Debtors have failed to make any payment on the Note since it matured on May 1, 2019.

23.     Over the next several weeks following May 1, 2019, Maxwell and Blue communicated regarding a possible further extension of the maturity date of the Note and the terms of any such extension, with the continued understanding that payment had to be made before June 30, 2019.  At the same time, Blue was allegedly concluding another transaction with the Procter & Gamble Company (the "Joy Transaction") through one or more entities in which Blue has an interest and/or over which he exercises control, separate from the Anticipated Merger for which the Loan was provided.[2]

24.     As part of his fraudulent scheme to avoid repayment, Blue falsely promised to give PSL 15% of the Joy Transaction.  Needless to say, Blue broke this promise too.  In fact, when Proctor & Gamble inquired about the Loan on the books of Capital Park, Blue lied again.  Blue falsely represented in writing that the PSL loan was related to a legacy investor and had been rolled into equity.  PSL never invested in Capital Park, and the PSL loan was never rolled into equity.

25.     Meanwhile, the progress of the negotiations regarding the Anticipated Merger appeared to slow and/or come to a standstill.  Over the next few weeks, Blue made a number of

---

[2] Upon information and belief, Blue forged several documents in connection with the Joy Transaction.

representations to PSL regarding when the Anticipated Merger was expected to close and/or issues purportedly delaying the closing of the Anticipated Merger.

26.     On or about May 15, 2019, Blue forwarded to PSL a term sheet from an alleged third-party lender ("CSM"), pursuant to which CSM would allegedly lend Capital Park MC funds sufficient to pay off the amounts owed under the Agreement.

27.     In particular, the term sheet presented by CSM included, among others, the following terms:

    a.  A loan amount of $3.5 million, based on a $3 million repayment obligation to PSL;

    b.  A maturity date of one year from the date of closing;

    c.  While no interest accrued on the loan, a premium would be applied at the time of pay off. Assuming the loan was paid off on or before the maturity date, the premium ranged from 40 to 55% of the funded amount of the loan depending on when the loan was repaid;

    d.  If the loan was not paid in full by the maturity date, provisions relating to the calculation of the premium and a default rate of interest post-maturity; and

    e.  The grant of warrants with a nominal exercise price which would be exercisable into an equity ownership equivalent to 20% of Capital Park MC's equity interest in certain contemplated transactions.

28.     Blue and Maxwell then began to discuss a further extension of the Agreement as an alternative to the CSM term sheet, with the understanding that the Debtors would repay the Loan on or before June 30, 2019, to allow Maxwell to take advantage of a tax planning opportunity to save up to $1 million.

29.     PSL was willing to engage with the Debtors regarding a further extension of the Loan because Blue represented to PSL that the Anticipated Merger would close before June 24, 2019, which closing would allegedly provide the Debtors money to repay the Note, as amended.

30.     On or around May 30, 2019, Blue informed Maxwell that the Anticipated Merger had a hard target to close during the week of June 17, 2019.  Maxwell asked Blue to confirm that "hard" meant the Anticipated Merger must close.  Blue confirmed "hard" meant "it must."  As a result of these representations, PSL refrained from exercising its rights under the Agreement and the Note at that time.

31.     Around May 30, 2019, PSL proposed the following terms for a further extension of the Note in reliance on Blue's representations of the Anticipated Merger date's hard closing deadline: (1) the maturity date would be extended to June 24, 2019; (2) the Debtors would pay an extension fee totaling $150,000 for May 2019, plus $4,500 per day for the period from June 1 through June 24, 2019; and (3) the Debtors would make a payment of $3,000,000 at the closing of the Anticipated Merger, which Blue represented would occur on or before June 24, 2019, as payment for the amount owed under the Note.

32.     By a text message on May 31, 2019, Blue, on behalf of the Debtors, replied, "terms Agreed to.  Should I have the amendment letter prepared?"  Maxwell responded by text message, writing "Yes, Please do!!!"

33.     This exchange of text messages evidences the parties' mutual intent to be bound.

34.     On June 12, 2019, PSL received a preliminary draft of a second amendment to the Agreement from the Debtors.  The draft omitted, among other things, a maturity date.

35.     By text message of June 20, 2019, Maxwell asked Blue for an update regarding the timing of the closing of the Anticipated Merger from the proceeds of which PSL was to be repaid. Blue had no new information to share.  In response, Maxwell wrote, "I would think you'd know if we're closing tomorrow.  Timing is critical for me if it's not tomorrow will Monday be the day?"

36.     On June 21, Maxwell reiterated his concern that the merger would not close before the end of the following week, *i.e.*, June 28, 2019. Blue replied, "I'll get it done or worse case just get you your money back well before then."

37.     On June 22, Maxwell again communicated the magnitude of the exposure that PSL would face if the Debtors did not make the $3 million payment as agreed on or about June 24, writing, "I can't go past Wed or Thursday on this or it will cost me over a million dollars."

38.     Over the next few days PSL continued to check in with Blue regarding the status of the closing of the Anticipated Merger. On June 26, Maxwell wrote, "[w]e have entered the high risk zone." Blue wrote in response, "I've been viewing this as that for the last month. The reality is if i [sic] cost you a million even by an hour I have to eat that period." Blue acknowledged that if he caused PSL to lose its tax planning opportunity, he would be responsible for the loss.

39.     On June 27, Blue again acknowledged the obligation to make PSL whole for the tax exposure it expected to face if Debtors failed to repay at least $3 million by the end of June. Blue represented that the Debtors were seeking an alternative funding source to repay PSL, writing, "I'm Waiting on an inbound wire payment to cover you. If you're drop dead is today and you're a million dollars exposed I'll have to cover it but it will need to be back ended a bit because all I have coming in is right at $3mm." Later that day, Maxwell responded, "in all fairness if I get this money tomorrow There won't be a 1 mil obligation. You'll only be required to satisfy the latest iteration of our understanding [*i.e.*, the agreement reached as of May 31, 2019] plus $22,500 [an additional extension fee for the period after June 24, 2019]."

40.     By June 28, 2019, it was clear that the Debtors would not be able to pay PSL $3 million as promised. At 4:01 p.m. that day, Blue told PSL, "I think I'll have to gross You up for Your tax exposure." Blue was thus confirming his prior obligation to compensate PSL for the

potential tax loss. Maxwell subsequently informed Blue that PSL's potential tax exposure would likely be less than $1 million.

41.     Even after the Debtors missed the end of June payoff deadline, the parties continued to communicate. On July 9, 2019, Blue represented to PSL that the plan was "to advance you the $3m this Friday [July 12] and carry the balance for a period . . . if that were 6 months it would create breathing room for me." Maxwell responded, "I'm happy to work with you to achieve our mutual needs on this. I really need to get that 3 million on Friday. We can figure out 6 month plan but everything hinges on your ability [to] get that 3 in my account by Friday."

42.     On July 11, 2019, Blue sent PSL a number of text messages which communicated his intent to pay PSL the following day.

43.     The Debtors did not pay PSL any funds by wire or any other means on July 12, 2019, or at any time thereafter.

44.     Since July 12, 2019, Blue has ignored multiple phone calls from Maxwell and appears to have blocked Maxwell's number from his cell phone. Maxwell was able to get through to Blue's cell phone line once and recognized Blue's voice answering the phone, but Blue falsely told Maxwell that he had the wrong number and hung up.

45.     On August 1, 2019, PSL filed a Verified Petition for Rule 202 Deposition in the District Court of Dallas County, Texas in Cause No. DC-19-10857 (the "State Court Petition") to depose and obtain documents from the Debtors in anticipation of suit and investigation of potential claims. None of the Debtors responded to the State Court Petition. The Court granted PSL's Petition, but the Debtors did not respond to attempts to schedule depositions.

46.     PSL has since learned that Blue provided forged financial statements to the other party to the Anticipated Merger, JHT Holdings, Inc. ("JHT"), in connection with the Anticipated

10

Merger and that, at the time of the Anticipated Merger, Blue did not have funds sufficient to close the transaction.

47.     In January of 2019, shortly before PSL extended its $2,000,000 loan to Debtors, Blue was required to make a $2,000,000 cash deposit under the Merger Agreement.  Failure to make the cash deposit was cause for JHT to terminate the Merger Agreement.  The check Blue provided to meet this requirement was returned for insufficient funds.

48.     In February 2019, JHT discovered that the financial statements Blue had provided were forged.  By letter dated February 11, 2019, JHT provided written notice that JHT was terminating the Merger Agreement, and JHT demanded payment of the $10,000,000 termination fee.

49.     Blue never informed PSL that the Merger Agreement had terminated.

50.     JHT has since obtained default judgment against Blue and Capital Park Management Company for breach of contract, fraud, and fraudulent inducement in connection with the Anticipated Merger.  *JHT Holdings, Inc. v. Capital Park Mgmt. Co. LLC, et al.*, No. 2019-0161-JRS, 2019 WL 3802505 (Del. Ch. Aug. 9, 2019).

51.     Upon information and belief, Blue never planned to repay PSL and has misappropriated the money entrusted in him for personal use.

## CLAIMS FOR RELIEF

### *Count I: Determination of Dischargeability under 11 U.S.C. § 523(a)(2)(A) –– PSL*

52.     The allegations contained in the paragraphs above are incorporated herein by reference.

53.     Section 523(a)(2)(A) of the Bankruptcy Code provides that an individual debtor is not discharged from any debt for money, property, or services obtained by false pretenses, a false representation, or actual fraud.

54.    Blue, individually and through his companies, orchestrated a scheme that resulted in PSL transferring $1.9 million to Blue because of his false pretense that the Agreement was a legitimate loan transaction.

55.    Blue made several false representations to PSL prior to the Agreement's execution. Blue then maintained the false pretense regarding the Agreement's legitimacy for several months after he was entrusted with the Loan funds.

56.    At all relevant times, Blue knew the money he received from PSL would not be repaid and he had no intent to ever repay PSL the amounts transferred in connection with the Agreement.

57.    PSL justifiably relied on Blue's false pretenses, false representations, and actual fraud described above.  Further, PSL in good faith believed that the Agreement was a legitimate loan transaction.

58.    As a proximate cause of PSL's justifiable reliance, PSL has suffered material and substantial injuries, including, but not limited to, all amounts owed under the Agreement, as amended, totaling more than $4,535,000 at the time of filing this Complaint, and all other damages to be proven at trial.

59.    PSL therefore respectfully requests that the Court declare all of Blue's debts owed to PSL are not dischargeable under 11 U.S.C. § 523(a)(2)(A).

*Count II: Determination of Dischargeability under 11 U.S.C. § 523(a)(4) –– PSL*

60.    The allegations contained in the paragraphs above are incorporated herein by reference.

61.     Section 523(a)(4) of the Bankruptcy Code provides that an individual debtor is not discharged from any debt arising from fraud or defalcation while acting in a fiduciary capacity, embezzlement, or larceny.

62.     Blue embezzled funds from PSL as part of his scheme to defraud PSL.  Specifically, Blue isolated the Loan proceeds for himself and out of PSL's reach after the proceeds were entrusted in him.  He then fraudulently misappropriated the Loan proceeds.  At all relevant times, Blue intended to misappropriate the Loan proceeds for his personal use.  Blue has not provided any explanation of where the money has gone and has blatantly ignored PSL's attempts to be repaid.

63.     As a result of Blue's embezzlement of the Loan proceeds, PSL has suffered material and substantial injuries, including, but not limited to, all amounts owed under the Agreement, as amended, totaling more than $4,535,000 at the time of filing this Complaint, and all other damages to be proven at trial.

64.     PSL therefore respectfully requests that the Court declare all of Blue's debts owed to PSL are not dischargeable under 11 U.S.C. § 523(a)(4).

### *Count III: Determination of Dischargeability under 11 U.S.C. § 523(a)(6) –– PSL*

65.     The allegations contained in the paragraphs above are incorporated herein by reference.

66.     Section 523(a)(6) of the Bankruptcy Code provides that an individual debtor is not discharged from any debt arising from a willful and malicious injury by the debtor to another entity or to the property of another entity.

67.    Blue willfully and maliciously injured PSL and its property by intentionally and deliberately misappropriating the Loan proceeds.  PSL had a security interest in the Loan proceeds. By misappropriating the Loan  proceeds, Blue injured PSL's security interest.

68.    As a result of Blue's willful and malicious injury to PSL's property, PSL has suffered material and substantial injuries, including, but not limited to, all amounts owed under the Agreement, as amended, totaling more than $4,535,000 at the time of filing this Complaint, and all other damages to be proven at trial.

69.    PSL therefore respectfully requests that the Court declare all of Blue's debts owed to PSL are not dischargeable under 11 U.S.C. § 523(a)(6).

### Count IV: Determination of Dischargeability under 11 U.S.C. § 523(a)(6) –– Maxwell

70.    The allegations contained in the paragraphs above are incorporated herein by reference.

71.    Section 523(a)(6) of the Bankruptcy Code provides that an individual debtor is not discharged from any debt arising from a willful and malicious injury by the debtor to another entity or to the property of another entity.

72.    Blue falsely represented to Maxwell that he would repay PSL the amounts transferred in connection with the Agreement before the end of June 2019.  Blue knew that this deadline was important for Maxwell to take advantage of a tax savings opportunity.

73.    Maxwell had a property interest in the tax savings opportunity.

74.    As the deadline approached, Blue falsely represented to Maxwell that, if he were not able to repay the Loan by the end of June 2019, he would make Maxwell whole for the up to $1 million tax exposure he would face as a result of Debtors' failure to timely repay the Loan.

75.    At all relevant times, Blue knew the money he received from PSL would not be repaid and he had no intent to ever repay PSL the amounts transferred in connection with the

Agreement, or to repay Maxwell for the tax exposure. Thus, Blue knew the harm he would cause to Maxwell's property interest in the tax savings opportunity.

76. As a proximate cause of Maxwell's justifiable reliance on Blue's representations, Maxwell has suffered material and substantial injuries to its property interest, including, but not limited to, up to $1 million in potential tax exposure, and all other damages to be proven at trial.

77. Maxwell therefore respectfully requests that the Court declare all of Blue's debts owed to Maxwell are not dischargeable under 11 U.S.C. § 523(a)(6).

### *Count V: Breach of Contract –– PSL*

78. The allegations contained in the paragraphs above are incorporated herein by reference.

79. Blue, individually and through his companies, entered into the Agreement with PSL under which Blue was obligated to repay the Loan and fees as set out in the Agreement and its amendments.

80. Blue fraudulently misappropriated the Loan proceeds for his personal use. Blue has not provided any explanation of where the money has gone and has blatantly ignored PSL's attempts to be repaid.

81. As a result of Blue's breach of the Agreement, PSL has suffered material and substantial injuries, including, but not limited to, all amounts owed under the Agreement, as amended, at the time of filing totaling more than $4,535,000, and all other damages to be proven at trial, including reasonable attorneys' fees.

### Count VI: Fraud –– PSL

82.     The allegations contained in the paragraphs above are incorporated herein by reference.

83.     Blue, individually and through his companies, orchestrated a scheme that resulted in PSL transferring $1.9 million to Blue because of his false pretense that the Agreement was a legitimate loan transaction.

84.     Blue made several false representations to PSL prior to the Agreement's execution. Blue then maintained the false pretense regarding the Agreement's legitimacy for several months after he was entrusted with the Loan funds.

85.     At all relevant times, Blue knew the money he received from PSL would not be repaid and he had no intent to ever repay PSL the amounts transferred in connection with the Agreement.

86.     PSL justifiably relied on Blue's false pretenses, false representations, and actual fraud described above.  Further, PSL in good faith believed that the Agreement was a legitimate loan transaction.

87.     As a proximate cause of PSL's justifiable reliance, PSL has suffered material and substantial injuries, including, but not limited to, all amounts owed under the Agreement, as amended, at the time of filing totaling more than $4,535,000, and all other damages to be proven at trial, including reasonable attorneys' fees.

### Count VII: Breach of Contract –– Maxwell

88.     The allegations contained in the paragraphs above are incorporated herein by reference.

89.     Blue, individually and through his companies, agreed that if the Debtors caused Maxwell to lose his tax savings by not paying the amounts owed under the Agreement by June 30, 2019, they would be responsible for the loss.  However, despite Blue's promises, the Debtors neither paid the amounts owed by June 30 nor made Maxwell whole for his loss.

90.     As a result of Blue's breach of the Agreement, PSL has suffered material and substantial injuries, including, but not limited to, up to $1 million in potential tax exposure, and all other damages to be proven at trial.

### Count VIII: Fraud –– Maxwell

91.     The allegations contained in the paragraphs above are incorporated herein by reference.

92.     Blue falsely represented to Maxwell that he would repay PSL the amounts transferred in connection with the Agreement before the end of June.  Blue knew that this deadline was important for Maxwell to take advantage of a tax savings opportunity.  As the deadline approached, Blue falsely represented to Maxwell that, if he were not able to pay by the end of June, he would make Maxwell whole for the up to $1 million tax exposure he would face as a result of Debtors' failure to timely repay the Loan.

93.     At all relevant times, Blue knew the money he received from PSL would not be repaid and he had no intent to ever repay PSL the amounts transferred in connection with the Agreement, or to repay Maxwell for the tax exposure.

94.     Maxwell justifiably relied on Blue's false pretenses, false representations, and actual fraud described above.

95.     As a proximate cause of Maxwell's justifiable reliance, Maxwell has suffered material and substantial injuries, including, but not limited to, up to $1 million in potential tax exposure, and all other damages to be proven at trial.

## PRAYER

WHEREFORE, PSL and Maxwell respectfully request the Court enter judgment in their favor against Blue as requested in this Complaint, specifically rendering a judgment:

a. Determining that Blue's debts to PSL and Maxwell are nondischargeable pursuant to sections 523(a)(2)(A), (a)(4), and/or (a)(6) of the Bankruptcy Code;

b. Granting PSL judgment in the amount of $4,535,000, plus interest which continues to accrue, and all other damages to be proven at trial, including reasonable attorneys' fees;

c. Granting Maxwell judgment in the amount of his full tax liability, and all other damages to be proven at trial; and

d. Granting PSL and Maxwell all other and further relief to which they may be justly entitled, including reimbursement for all costs and expenses in prosecuting this adversary proceeding, including all expenses approved by this Court and payment of any expenses, court costs, deposition costs, subpoena fees, witness fees or other expenses incurred in connection with the litigation.

Dated: March 6, 2020

Respectfully submitted,

**BAKER BOTTS L.L.P.**

*/s/ Omar J. Alaniz*
Omar J. Alaniz, State Bar No. 24040402
David M. Genender, State Bar No. 00790757
Fareed I. Kaisani, State Bar No. 24104017
2001 Ross Avenue, Suite 900
Dallas, Texas 75201
Telephone: (214) 953-6593
Fax: (214) 953-6503
omar.alaniz@bakerbotts.com
fareed.kaisani@bakerbotts.com

Danny David, State Bar No. 240228267
910 Louisiana Street
Houston, Texas 77002
Telephone: (713) 229-1234
Fax: (713) 229-1522
danny.david@bakerbotts.com

**COUNSEL FOR PLAINTIFFS**